# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-00927-COA

MARVIN TITUS A/K/A M.T.                                        APPELLANT

v.

STATE OF MISSISSIPPI                                            APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/05/2015 |
| TRIAL JUDGE: | HON. MARGARET CAREY-MCCRAY |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: BENJAMIN ALLEN SUBER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF MURDER AND SENTENCED AS A HABITUAL OFFENDER TO LIFE WITHOUT ELIGIBILITY FOR PAROLE, FOLLOWED BY A CONSECUTIVE TEN-YEAR FIREARM-ENHANCEMENT SENTENCE, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 03/14/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., CARLTON AND WESTBROOKS, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.     A jury found Marvin Titus guilty of deliberate-design murder and the display of a firearm during the commission of the murder.  *See* Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014); Miss. Code Ann. § 97-37-37(1) (Rev. 2014).  On appeal from his conviction and

sentences, Titus argues that the circuit court erroneously denied his motion for a new trial because the verdict was against the overwhelming weight of the evidence. Finding no error, we affirm.

**FACTS**

¶2. At 1:09 a.m. on January 18, 2013, Raymond Vicks placed a 911 call to the Greenville Police Department to report a shooting. Vicks testified that he was at home asleep when someone knocked on his door. Although Vicks was initially reluctant to open the door, he testified that the person knocked again and called out his name. Vicks further stated that the person identified himself as Chris Walls, a friend who lived seven or eight houses down from Vicks's home. Vicks opened the door and then caught Walls as Walls fell to the ground. Vicks testified that Walls stated, "[T]hey shot me, they shot me . . . ."

¶3. According to Vicks, Walls had blood shooting out of his arm from a bullet wound. After emergency personnel arrived and transported Walls to the hospital, Vicks cleaned up the blood on his front porch. He then went to the hospital to check on Walls's condition. On his way to the hospital, Vicks testified that he called Stanley Parnell and asked Parnell to inform Walls's mother of the shooting. When he arrived at the hospital, however, Vicks did not see Walls's mother. As a result, he left the hospital to inform her of the shooting.

¶4. Upon returning to the hospital, Vicks encountered Titus and Parnell. Vicks testified that, as he walked through the hospital door, Titus asked whether Walls had identified his shooter. At the time of the shooting, Titus was staying at Walls's house. Although Walls

2

had previously kicked Titus out of his house, Vicks testified that Walls always allowed Titus to return. Vicks testified that Walls regularly sold drugs out of the house and that Walls once kicked Titus out of the house for selling bad drugs to someone. Vicks stated that people sometimes arrived to purchase drugs while Walls was away and that Titus, pretending to be Walls, would conduct the transaction but would sell the purchasers fake drugs.

¶5. Vicks further testified that he spent time at Walls's house the day before the shooting and visited with Walls, Titus, and Parnell. Vicks testified that he stayed until a little before 2:45 p.m., when his children got out of school. Vicks said that he observed nothing unusual between Titus and Walls while he was hanging out with them.

¶6. In response to Vicks's 911 call, law-enforcement officers arrived on the scene. Sergeant Maricus Hibbler testified that he arrived at Vicks's home and observed Walls lying on the front porch and wailing in pain. According to Sergeant Hibbler's testimony, Walls slipped in and out of consciousness and was unable to answer questions about who shot him. Sergeant Hibbler further stated that the porch where Walls had lain was completely covered in blood as though "someone had grabbed a bucket and just [thrown] blood" on the area.

¶7. Sergeant Hibbler and Investigator Steven O'Neal each testified that they followed the blood trail from Vicks's front porch and discovered a blood-stained coat and cell phone. Investigator O'Neal testified that there was an entrance and exit hole in the right arm of the coat. Sergeant Hibbler and Investigator O'Neal both stated that the blood trail ended at Walls's home, where Investigator O'Neal observed a pool of blood at the rear of Walls's

3

white Cadillac. Sergeant Hibbler also testified that the Cadillac had two broken driver's side windows, a bullet hole in the rear driver's side door, and blood on the rear of the vehicle. Although Investigator O'Neal searched for further evidence, he stated that he was unable to find a gun, shell casings, or any more blood outside Walls's home.

¶8.　　While standing at the rear of the Cadillac, Investigator O'Neal testified that Titus walked over from the front of Walls's home. Titus said that he had been inside the house washing clothes when he heard gunshots. However, Titus further told Investigator O'Neal that he did not think anything of the shots until he saw the blue police lights outside the house. Titus then walked away, and Investigator O'Neal continued to search for additional evidence.

¶9.　　On cross-examination, Investigator O'Neal admitted that law enforcement failed to discover any physical evidence during the course of their investigation to connect Titus to Walls's shooting. The gunshot-residue kit that law enforcement performed on Titus after the shooting failed to find any sign of gunshot residue on Titus's skin. According to Investigator O'Neal, however, the negative result did not foreclose the possibility that Titus had shot Walls. Investigator O'Neal testified that Walls was shot around 1 a.m. on January 18, 2013, but that the gunshot-residue kit performed on Titus occurred hours later around lunchtime. Investigator O'Neal testified, therefore, that Titus could have had time to wash his hands and perhaps remove any trace of gunshot residue. In addition to the negative gunshot-residue test, Investigator O'Neal confirmed that a search of the room Titus occupied at Walls's home

4

revealed nothing to link Titus to the shooting.

¶10.    According to Investigator O'Neal, law-enforcement officers were unable to initially develop any suspect in Walls's shooting. However, about two months after the shooting, a correctional officer at the regional jail facility contacted the Greenville Police Department. The correctional officer reported that an inmate, Stephanie Moudy, wished to speak to an investigator about the case. As a result, two investigators visited Moudy and obtained her statement.

¶11.    According to Moudy's trial testimony, she had known both Walls and Titus for a number of years. Moudy admitted that she was a drug addict and had bought drugs from both men. Moudy stated that she went to see Walls the morning of the shooting to get drugs from him. Moudy further testified that Walls was getting ready for work when she arrived. Although she did not have any money to purchase drugs, Moudy testified that she convinced Walls to give her drugs in exchange for sexual favors. Before she and Walls could complete their transaction, however, someone knocked on the door. Walls asked who it was, and the person identified himself as "M.T." Moudy testified that "M.T." was Titus's nickname. She further testified that she was very familiar with Titus's voice because she had known him so long, and she stated that she recognized the voice as his.

¶12.    Moudy stated that Walls asked her to step behind a door leading to another part of the house. She did so, and then she heard Walls let the newcomer into his bedroom. Moudy testified that she heard Walls talking to the newcomer, whom she recognized as Titus by the

5

sound of his voice. Moudy stated that Titus wanted Walls to give him some drugs to sell. However, Moudy said that Walls refused, and the men's conversation became louder. Moudy testified that she then heard sounds of a struggle and a gunshot. She further testified that she heard the door leading out of the house open and close followed by two more shots outside the house.

¶13. Moudy stated that she then heard stuff in Walls's room being moved around but that she did not actually see the person who was inside the bedroom. Moudy testified that she managed to escape Walls's house and return to the home where she lived with her boyfriend, Willie Shanklin. Moudy climbed in her house through a window and then hid in the bedroom closet. She testified that she was scared to death and began crying. Shanklin, who was asleep in the bedroom, heard Moudy crying and came to check on her. Moudy said that she told Shanklin what she had heard, and he advised her not to tell anyone about the shooting.

¶14. Moudy further testified that she was sanctioned by the drug court a few days after the shooting and was in jail when she saw Walls's son on television. Moudy testified that she knew Walls's son and felt that she had to reveal what she knew about the shooting if she wanted to stay drug free. As a result, Moudy asked one of the jailers to contact the detective on Walls's case so she could make a statement.

¶15. Despite Moudy's statement that she heard a struggle and a gunshot fired inside Walls's bedroom, Investigator O'Neal testified that he saw no evidence of blood when he

searched the room. Instead, Investigator O'Neal testified that Walls's blood trail appeared to begin outside the house at the rear of the Cadillac. Dr. Lisa Funte from the Mississippi Medical Examiner's Office testified as an expert in forensic pathology. Dr. Funte explained that it was possible for Walls to be shot inside the house but to not lose any blood until he reached the outside of the house.

¶16.    Based on gunshot-residue injuries found on Walls's face, Dr. Funte concluded that Walls was shot from a range of six inches to four feet. Dr. Funte further testified that Walls suffered a gunshot to his right arm, which transected his brachial artery. According to Dr. Funte, even if Walls had been shot inside his bedroom, he may not have started bleeding until he exited his home. On direct examination, Dr. Funte explained two possible hypothetical theories:

> When you have muscular arteries injured such as in this gunshot wound where the [bullet] transected that artery, there is a reflex that occurs in that artery where the artery constricts[,] preventing blood flow, and it's a response of your body to prevent you hopefully from bleeding to death.
>
> It lasts a transient amount of time. It varies from individual to individual. It varies from injury to injury. So [Walls] may have been shot, [but due to] the constriction of that brachial artery upon the initial injury[,] he may not have seen blood flow for a short period of time.
>
> So it's possible if he were shot in the house there would be plenty of time for him to get outside before he started to bleed in any significant manner.
>
> Now, if he were wearing a shirt or there was a sleeve or something on the arm, the blood is [going to] soak into that, it's [going to] get redistributed. . . . [H]e may not bleed in the house at all. He may not even bleed for quite a while outside of the house. Blood may not leave the clothing for quite a while.

¶17.    During the State's case-in-chief, the jury also heard testimony from Christopher Dunn, who grew up with both Walls and Titus. Like Moudy, Dunn testified that "M.T." was Titus's nickname. Dunn stated that, after Walls's shooting, Titus revealed that he had been involved in a shootout with Jerry Jakewell and that Walls might have accidentally been hit during the shootout. Following Titus's alleged revelation, Dunn stated that he simply walked away because he did not want to get involved. Dunn further testified, however, that he had previously seen Titus with a gun in his possession.

¶18.    The State next called Monica Brown as a witness. Brown testified that she and Titus dated for about three years and that, during that time, they sometimes lived together. Brown testified that, at the time of the shooting, she was in Memphis, Tennessee. Although Titus had been living with her for several months, Brown testified that she did not allow him to stay at her house when she was out of town. As a result, Titus stayed at Walls's house.

¶19.    According to Brown, Titus told her during a March 2013 telephone conversation that he was involved in a shootout on the day of Walls's shooting. Brown testified that Titus said he was sitting outside Walls's house when a car with Jakewell and another person drove by. Brown testified that Titus told her the car turned around and that the occupants began shooting at him. Brown further stated that Titus said he returned gunfire and that Walls came outside during the exchange. Although Walls hid behind his Cadillac, Brown testified that Titus said he did not know whether one of his bullets or one of the other men's bullets hit Walls. Brown further testified that she had known Titus to carry a gun and that it was not

8

unusual for him to have a weapon in his possession.

¶20. Despite testimony by Dunn and Brown that Titus stated he was in a shootout with Jakewell on the day of Walls's shooting, Jakewell denied any such allegations. Jakewell testified that he was shot three times at close range in June 2012 and remained hospitalized until the end of August 2012. Even after returning home, Jakewell testified that the severity of his injuries confined him to bed rest until February or March 2013. He further testified that he received at-home assistance during the time he was confined to bed rest. Jakewell therefore testified that he was unable to participate in a shootout on the day of Walls's death in January 2013 and that he was at home asleep when Walls was shot.

¶21. In addition to giving instructions on murder, the circuit court instructed the jury on the lesser-included offense of manslaughter. After considering the evidence and trial testimony, however, the jury found Titus guilty of both deliberate-design murder and a firearm enhancement. The circuit court then sentenced Titus as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2015) to life imprisonment for the murder conviction and to a consecutive ten-year term for the firearm enhancement, with both sentences to be served in the custody of the Mississippi Department of Corrections. Titus filed an unsuccessful motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. Aggrieved by the circuit court's denial of his motion for a new trial, Titus appeals.

**DISCUSSION**

¶22. On appeal, Titus argues that the State failed to prove beyond a reasonable doubt that

9

he murdered Walls. He asserts that no physical evidence connected him to the crime and that the testimony of the State's main witness, Moudy, was contradictory and was insufficient to establish that he committed the crime. Contending that his murder conviction was clearly against the overwhelming weight of the evidence, Titus asks this Court to reverse his conviction and to remand the case for a new trial.

¶23. With regard to an appellate court's review of new-trial motions, the Mississippi Supreme Court has explained:

> The standard of review on a motion for a new trial is abuse of discretion. But a jury's verdict is given great deference by [an appellate court], and conflicts of evidence presented at trial are to be resolved by the jury. [An appellate court's] role of reviewing a challenge to the weight of the evidence is that of a thirteenth juror. Nevertheless, the evidence reviewed ought to be weighed in the light most favorable to the verdict. A new trial may be granted where the verdict is against the overwhelming weight of the evidence, or when the jury has been confused by faulty instructions, or when the jury has departed from its oath and its verdict is a result of bias, passion, and prejudice. [An appellate court], when reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, only will disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. To meet the unconscionable[-]injustice standard, the verdict must shock the conscience or rest on a complete lack of evidence.

*Dependable Abrasives Inc. v. Pierce*, 156 So. 3d 891, 895 (¶12) (Miss. 2015) (internal citations and quotation marks omitted).

¶24. Titus was charged with murder under section 97-3-19(1)(a), which states that "[t]he killing of a human being without the authority of law by any means or in any manner shall be murder . . . [w]hen done with deliberate design to effect the death of the person killed, or

of any human being . . . ." To convict Titus of Walls's murder, the State had to prove that Titus: (1) killed Walls; (2) without the authority of law; and (3) with deliberate design to effect Walls's death. *See Beasley v. State*, 136 So. 3d 393, 402 (¶30) (Miss. 2014). Because Titus never confessed to the crime and there were no eyewitnesses to the shooting, the State presented circumstantial evidence to establish its case. Our supreme court has clearly provided that "direct evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt." *Underwood v. State*, 708 So. 2d 18, 35 (¶49) (Miss. 1998) (citation omitted).

¶25. Although Titus argues on appeal that Moudy's testimony was inconsistent and lacked credibility, we recognize that "[t]he jury is the final arbiter of a witness's credibility" and "weighs the weight and worth of any conflicting testimony." *Williams v. State*, 794 So. 2d 1019, 1028 (¶59) (Miss. 2001) (citations omitted). Furthermore, our caselaw provides that "[t]he jury is free to draw all reasonable inferences [from witness testimony], and an appellate court will not review which of any possible inferences was the most reasonable." *Pryor v. State*, 771 So. 2d 958, 960 (¶9) (Miss. Ct. App. 2000) (citation omitted).

¶26. The record reflects that Titus was staying at Walls's home at the time of the shooting. Although Vicks testified that he had visited with Walls and Titus the day before the shooting and had witnessed no animosity between them, Vicks also stated that Walls had previously kicked Titus out of the house on multiple occasions.

¶27. In addition to Moudy, both Dunn and Brown testified that Titus went by the nickname

11

"M.T." and was known to sometimes have a gun in his possession. Dunn and Brown further testified that Titus revealed to them, on separate occasions, that he had been involved in a shootout outside Walls's home on the day of Walls's death and may have accidentally shot Walls. Brown stated that Titus said Walls came outside during the shootout and tried to hide behind his car. However, both Dunn and Brown testified that Titus was unsure whether a bullet may have hit Walls during the exchange of gunfire.

¶28. Although Brown and Dunn testified that Titus claimed he may have hit Walls during a shootout, Investigator O'Neal testified that Titus told him that he (Titus) was inside the house washing clothes when he heard gunshots. The State attempted to establish through Moudy's testimony, however, that both of these stories were false and that Titus shot Walls while fighting over drugs. Moudy testified that, just prior to Walls's shooting, she went to his house to obtain drugs. Before she completed her transaction with Walls, Moudy stated that someone knocked on the door. Moudy testified that the person identified himself as "M.T.," which she knew was Titus's nickname. Moudy further testified that she recognized the newcomer to be Titus by the sound of his voice. According to Moudy, she knew both Walls and Titus well, and she testified that she was very familiar with the sound of Titus's voice.

¶29. While standing behind a door from Walls's bedroom, Moudy testified that she overheard Titus ask Walls for drugs to sell. Moudy further stated that the men's conversation escalated—their voices grew louder, a struggle ensued, and she heard a gunshot fired from

12

inside the bedroom. Moudy then testified that she heard the door to the outside of the home open and close, followed by two more gunshots outside the home.

¶30. Investigator O'Neal testified that, upon following a trail of blood from Vicks's front porch to Walls's home, he observed a pool of blood at the rear of Walls's Cadillac. The Cadillac had two broken driver's side windows, a bullet hole in the rear driver's side door, and blood on the rear of the vehicle. Investigator O'Neal stated, however, that he found no sign of a gun, shell casings, or other blood outside Walls's home. In addition, he testified that he saw no evidence of blood or bullet holes inside Walls's room.

¶31. A test performed several hours after the shooting failed to find any gunshot residue on Titus's skin. According to Investigator O'Neal, this negative result did not foreclose the possibility that Titus had shot Walls. Investigator O'Neal testified that Walls was shot around 1 a.m. on January 18, 2013, and that the gunshot-residue kit performed on Titus occurred several hours later around lunchtime. Investigator O'Neal testified that Titus could have had time to wash his hands and attempt to remove any trace of gunshot residue. In addition to the negative gunshot-residue test, Investigator O'Neal testified that a search of the room Titus occupied at Walls's home likewise failed to reveal evidence to connect Titus to the crime. Investigator O'Neal further stated, though, that he had investigated other cases where the search of a suspect's room failed to disclose any relevant evidence.

¶32. Upon review of the circuit court's denial of Titus's motion for a new trial, we find no abuse of discretion. *See Dependable Abrasives*, 156 So. 3d at 895 (¶12). After hearing all

13

the evidence and testimony presented, and after receiving instruction on both murder and the lesser-included offense of manslaughter, the jury found Titus guilty. As previously discussed, the jury determines the credibility of witness testimony and is free to draw all reasonable inferences from the testimony. *Williams*, 794 So. 2d at 1028 (¶59); *Pryor*, 771 So. 2d at 960 (¶9). Viewing the evidence in the light most favorable to the verdict, we cannot find that the jury's verdict was "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Dependable Abrasives*, 156 So. 3d at 895 (¶12) (citation omitted). We therefore find that this assignment of error lacks merit.

¶33. **THE JUDGMENT OF THE WASHINGTON COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE AS A HABITUAL OFFENDER OF LIFE WITHOUT ELIGIBILITY FOR PAROLE, FOLLOWED BY A CONSECUTIVE TEN-YEAR FIREARM-ENHANCEMENT SENTENCE, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WASHINGTON COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**